## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| OLIVER TRIANA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NAKED WHEY, INC. d/b/a NAKED NUTRITION,<br>Defendant. | Case No. 1:25-cv-25168<br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Oliver Triana, by and through his counsel, files this Amended Class Action Complaint and Demand for Jury Trial against Naked Whey, Inc. d/b/a Naked Nutrition ("Naked Nutrition" or "Defendant") on behalf of himself and on behalf of a Class of similarly situated individuals, and alleges, on personal knowledge as to his own actions, and on investigation of counsel as to all other matters, as follows:

### NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of individuals who purchased Naked Nutrition Vegan Mass Gainer protein powders ("the Products").

2. Defendant manufactures and sells powdered protein and other health supplements at a premium price. Defendant touts the Products as clean, third-party-tested, and nutritious protein sources that are safe and appropriate for frequent consumption.

3. Recent independent testing revealed, however, that a single serving of one Product contains so much lead (a staggering 7.7 micrograms) that it exceeds a safe *weekly* threshold.[1]

---

[1] Paris Martineau, *Protein Powders and Shakes Contain High Levels of Lead*, Consumer Reports (Oct. 14, 2025), https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640.

4.      Further, the tested Product contained detectable levels of other harmful heavy metals, including arsenic and cadmium.[2]

5.      Based on these testing results, nutrition experts cautioned against consuming the Products at all, let alone as a source of nutrition.[3]

6.      Plaintiff brings this action on behalf of himself and a Class of similarly situated individuals who purchased the Products, thereby paying premium prices for products that are marketed as healthy and safe for daily consumption but contain dangerous and toxic heavy metals.

7.      Defendant's uniform conduct is equally applicable to Plaintiff and the Class. Plaintiff brings this class action against Defendant for violation of statutory consumer protection laws. Plaintiff seeks an order requiring Defendant to, among other things: (1) cease its false and misleading representations about the safety and fitness for consumption of its products; and (2) pay damages, restitution, and/or disgorgement to Plaintiff and Class members.

## PARTIES

8.      Plaintiff Oliver Triana is a natural person and a citizen of Texas, where he resides and intends to remain.

9.      Defendant Naked Nutrition is a Florida corporation with its principal place of business in Miami, Florida.

10.      Decisions regarding the formulation, testing, labeling, marketing, advertising, and sales of Defendant's products are made at or through its Miami headquarters. Defendant's presence

---

[2] Consumer Reports, *Heavy Metals in Protein Supplements Test Methodology and Test Results* (Oct. 2025), https://article.images.consumerreports.org/image/upload/v1761140939/prod/content/dam/CRO-Images-2025/Special%20Projects/Consumer-Reports-Protein-Powders-and-Shakes-Contain-High-Levels-of-Lead-Methodology-Test-Results-v2.pdf.
[3] *See id.*; Martineau, *supra* n.1.

in the market as well as the advertising to its customers are substantially connected to its operations in Florida.

11.    Defendant does not have a presence in any other U.S. state matching the concentration of its presence in Florida.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), in that (1) the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000; (2) Plaintiff is a citizen of Texas and Defendant is a citizen of Florida; and (3) this is a class action involving more than 100 class members and more than two-thirds of the class members reside in states other than the state in which Defendant is a citizen.

13.    This Court has personal jurisdiction over Defendant because Defendant is a citizen of Florida, conducts substantial business in Florida, and a substantial portion of the acts complained of took place in Florida.

14.    Venue is proper in the Southern District of Florida because Defendant's headquarters are located in this District, Defendant conducts business in this District and many of the events that gave rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### Defendant Markets the Products as Pure, Safe, and Healthy

15.    Defendant Naked Whey manufactures and sells a range of nutrition products like protein powders and health supplements that it advertises as giving consumers "control over what goes into [their] body.

16.    Defendant has curated its brand image to be a company that prioritizes healthy protein consumption through clean, simple ingredients.

3

17.    One of Defendant's product lines is the Vegan Mass Gainer Products, which it markets as safe for consumption and especially encouraged for consumers who are looking to gain weight and build muscle.[4]

18.    The Vegan Mass Gainer Products all consist of the same base formula of pea protein powder, organic rice protein powder, and organic maltodextrin. The flavored Products contain two to five additional ingredients for flavor.

19.    Defendant sells the Products directly on its website, including by subscription and through online retailers like Amazon and Walmart. As such, Plaintiff and the Class Members were exposed to Defendant's misrepresentations and omissions (a) on the packaging, which they viewed regardless of where they purchased the Products; (b) on Defendant's own website, which included pictures of the packaging and additional misrepresentations; and (c) on third-party websites that generally included pictures of the packaging and similar misrepresentations, such that Defendant is responsible for the misrepresentations and omissions.

20.    During the relevant time period, Defendant advertised the Products as a clean and complete source of vegan protein. Depending on flavor, the Product label states, "ONLY THREE PREMIUM INGREDIENTS WITH NOTHING TO HIDE" or "ONLY FIVE PREMIUM INGREDIENTS WITH NOTHING TO HIDE" or "PREMIUM VEGAN WEIGHT GAINER WITH NOTHING TO HIDE."[5]

21.    The "NAKED Store" Amazon webpage for the Products has pictured the front of the package, along with additional marketing infographics:

---

[4] Naked Vegan Mass (product listing on Amazon.com), https://www.amazon.com/Naked-Vegan-Mass-Artificial-Ingredients/dp/B083VTWMP8 (last visited Feb. 11, 2025).
[5] *Id.*





22.    Various other advertisements and infographics emphasize the purity of the Products, claiming that Defendant has "nothing to hide" regarding its contents.



23.    To bolster perceptions about the safety of the Product, Defendant also includes numerous representations about independent testing and quality standards.

24.     Specifically, Defendant represents that the product is pure, tested for heavy metals, meets FDA safety reference levels, and that its quality can be trusted[6]:



25.     Neither the packaging nor marketing materials make any disclosure whatsoever regarding the presence of lead and other heavy metals in the Products. To the contrary, the Products' packaging and marketing materials misleadingly and deceptively convey to reasonable consumers that the Products are high-quality, healthy, nutritious, and not contaminated with heavy metals. When reasonable consumers view the packaging and marketing materials' overall

---

[6] *Id.*

impression, misrepresentations, and omissions, they would have no reason to suspect that the Products contain heavy metals.

26.    Consumers like Plaintiff and Class Members rely heavily on Defendant to supply safe, nutritious Products and to provide accurate and complete information about the contents of the Products it sells.

27.    Unknown to Plaintiff or Class Members, Defendant has been marketing, distributing, and selling the Products tainted with significant, elevated concentrations of toxic heavy metals, including arsenic, cadmium, and lead.

28.    Defendant had a duty to ensure the Products were not deceptively, misleadingly, unfairly, or falsely marketed and that all material information was properly and fully disclosed, which it failed to do, including by its failure to sufficiently or adequately monitor or test for and disclose the presence of heavy metals in the Products.

29.    The elevated levels of arsenic, cadmium, and lead contradict and impede the central function of the Products.

**Testing Reveals Heavy Metals in the Products,
Exceeding Weekly Recommended Dose of Lead**

30.    In October 2025, Consumer Reports released a report of its independent testing of various protein powders, including a sample of the Products.

31.    The Consumer Reports testing revealed that the Products contain concerning and potentially dangerous levels of lead.[7]

---

[7] Martineau, *supra* n.1.

8

32.    Specifically, testing concluded that "Naked Nutrition's Mass Gainer powder contained 7.7 micrograms of lead per serving, which is roughly 1,570 percent of CR's level of concern for the heavy metal."[8]

33.    Testing also revealed that the Products contain detectible amounts of arsenic and cadmium, despite Defendant's representations that its Products are "independently tested for heavy metals" and "Verified for Purity."

**Consumption of Heavy Metals Poses Real Health Risks**

34.    Heavy metals are neurotoxins, i.e., poisons that affect the nervous system.[9]

35.    Experts acknowledge and agree that there are no known safe levels of heavy metals.[10]

---

[8] *Id.*

[9] *See*, *e.g.*, U.S. House of Representatives, Committee on Oversight and Reform, Subcommittee on Economic and Consumer Policy, Staff Report, *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*, at 2 (Feb. 4, 2021) [hereinafter Congressional Committee Report], https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf ("The Food and Drug Administration and the World Health Organization have declared [inorganic arsenic, lead, cadmium, and mercury] dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects.").

[10] Transcript from Public Meeting, *Closer to Zero Action Plan: Impacts of Toxic Element Exposure and Nutrition at Different Crucial Developmental Stages for Babies and Young Children* (Nov. 18, 2021) [hereinafter Closer to Zero Public Meeting], https://www.fda.gov/media/155396/download?attachment, at 32 (Conrad Choiniere, Director, Office of Analytics and Outreach in the U.S. Food and Drug Administration's Center for Food Safety and Applied Nutrition: "[F]or the contaminants we are discussing today, we have not identified safe levels of exposure for developmental outcomes."), at 72 (Dr. Margaret Karagas, Professor and Chair of the Department of Epidemiology at the Geisel School of Medicine at Dartmouth College: "Arsenic, cadmium, mercury and lead, shown here, circled in these red circles, they do not have any known physiologic essential function in the body and there is no known safe level to our knowledge."), at 179 (Dr. Aparna Bole, American Academy of Pediatrics: "There is no known safe level of exposure to these metals for children.").

36.      Exposure to heavy metals, even in small amounts, can lead to life-long effects. Heavy metals can remain in the human body for years and, as a result, can accumulate in the body, such as in the kidneys and other internal organs, increasing their risk to a person over time.[11]

37.      Because heavy metals bioaccumulate in the body, even regular consumption of small amounts can increase the material risk of various health issues, including bladder, lung, and skin cancer; cognitive and reproductive problems; and type 2 diabetes.[12]

38.      Exposure to heavy metals has also been shown to have long-lasting effects on cardiovascular toxicity, hypertension, arrhythmia, atherosclerosis,[13] as well as gastrointestinal and kidney dysfunction, nervous system disorders, skin lesions, vascular damage, immune system dysfunction, birth defects, and cancer.[14]

**The Harmful Effects of Lead Consumption**

39.      Lead is a heavy metal that is highly toxic to humans and has been identified as a carcinogen. The harmful effects of lead cannot be reversed or remediated due to its accumulation in the body over time.[15]

40.      There is no health benefit to the inclusion of lead in food products.

---

[11] *See* Congressional Committee Report, *supra* note 9, at 2, 9.

[12] *See Arsenic*, World Health Organization (Dec. 7, 2022) [hereinafter *Arsenic*, WHO], https://www.who.int/news-room/fact-sheets/detail/arsenic; *Lead Poisoning*, World Health Organization (Sept. 27, 2024) [hereinafter *Lead Poisoning*, WHO], https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

[13] Pan Ziwei et al., *Heavy Metal Exposure and Cardiovascular Disease*, Circulation Research (Apr. 25, 2024), https://www.ahajournals.org/doi/10.1161/CIRCRESAHA.123.323617?url_ver=Z39.88-2003.

[14] Mahdi Balali-Mood et al., *Toxic Mechanisms of Five Heavy Metals: Mercury, Lead, Chromium, Cadmium, and Arsenic*, Frontiers in Pharmacology (Apr. 13, 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8078867.

[15] *See* Gagan Flora et al., *Toxicity of Lead: A Review with Recent Updates*, Interdiscip. Toxicol. (Jun 20212), https://pmc.ncbi.nlm.nih.gov/articles/PMC3485653/.

41.     Lead exposure can impact several body systems. Once absorbed by the body, lead is distributed throughout the brain, liver, kidneys, and bones. It interferes with biochemical processes by binding to enzymes, mimicking other important metals (such as calcium) in cells, and thereby disrupting cellular and nerve-cell functions.[16]

42.     Lead remains in the body, stored in the teeth and bones where it accumulates over time. Lead stored in bone is released into the blood during pregnancy and exposes the fetus to the toxic metal.[17]

43.     Because lead accumulates in the body, even very low-level exposure can be hazardous over time. Lead is a cumulative toxin in bones and soft tissues, where it continues to disrupt critical biological functions long after exposure. The risk intensifies with repeated or prolonged exposure. The Mayo Clinic warns that "[s]igns and symptoms usually don't appear until the amount of lead detected in the blood has climbed to a dangerous level."[18]

44.     As a cumulative toxin, lead affects multiple organ systems, including the neurological, hematological, gastrointestinal, cardiovascular, immune, and renal systems. Even small amounts of exposure can cause serious health problems.[19] At very high levels, lead poisoning can be fatal.[20] According to the World Health Organization, "[t]here is no known safe blood lead concentration."[21]

---

[16] *What Are Possible Health Effects From Lead Exposure?*, Agency for Toxic Substances and Disease Registry, https://archive.cdc.gov/www_atsdr_cdc_gov/csem/leadtoxicity/physiological_effects.html (last reviewed May 24, 2023).

[17] *Lead Poisoning*, WHO, *supra* note 12.

[18] *Lead Poisoning*, Mayo Clinic (Dec. 24, 2025), https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717.

[19] *Id*.

[20] *Id.*

[21] *Lead Poisoning*, WHO, *supra* note 12.

45.     In adults, lead exposure has been linked to increased blood pressure, cardiovascular disease, and kidney damage.[22] Low levels of exposure in children is associated with reduced IQ, attention-span problems and behavioral changes.[23] Young children absorb the toxin more easily than adults, making their developing nervous systems more sensitive to its effects.[24] Because lead crosses the placenta, lead exposure during pregnancy can affect fetal growth, oftentimes causing low birth weight or pre-term birth.[25]

46.     According to the U.S. Centers for Disease Control, "[t]he effects of lead poisoning can be permanent and disabling."[26]

47.     Contrary to Defendant's suggestion in its marketing materials, the Food & Drug Administration (FDA) sets reference levels for *total* daily lead consumption, not for specific products or single servings thereof. And contrary to Defendant's suggestion in its marketing materials, the FDA provides reference levels only for children and females of childbearing age, which are 2.2 and 8.8 micrograms per day, respectively.[27]

**The Harmful Effects of Arsenic Consumption**

48.     There is no health benefit to the inclusion of arsenic in food products.

49.     Arsenic is toxic to humans, classified as a carcinogen, and is one of the World Health Organization's ten chemicals "of major public concern."[28]

---

[22] *Id.*

[23] *Exposure To Lead: A Major Public Health Concern*, World Health Organization (2021), https://iris.who.int/server/api/core/bitstreams/ca00fb93-9bd4-4b5c-904c-6d061677132f/content.

[24] *See Lead Poisoning*, WHO, *supra* note 12.

[25] *Id.*

[26] *About Childhood Lead Poisoning Prevention*, CDC (Aug. 21, 2025), https://www.cdc.gov/lead-prevention/about/index.html.

[27] Brenna M. Flannery & Karlyn B. Middleton, *Updated interim reference levels for dietary lead to support FDA's Closer to Zero action plan* (Jun. 16, 2022), https://www.sciencedirect.com/science/article/pii/S0273230022000897.

[28] *Arsenic*, World Health Organization (Dec. 7, 2022), https://www.who.int/news-room/fact-sheets/detail/arsenic.

50.     Arsenic can cause cancer, as well as diabetes, atherosclerosis, and potentially cardiovascular disease when ingested chronically.[29]

51.     Arsenic can affect multiple organs and systems, including the endocrine, immune, nervous, and respiratory system; liver, kidney, and bladder; prostate glands; and skin.[30]

52.     Chronic or long-term exposure to arsenic can cause skin disease and is also associated with skin, bladder, and lung cancer, as well as adverse pregnancy outcomes, infant mortality, diabetes, and cardiovascular disease.[31]

53.     Even low-level exposure to arsenic can result in severe long-term health effects and increase the risk of other types of chronic disease.[32] Long-term exposure to lower levels of arsenic can also cause a shortage of red and white blood cells, which can cause fatigue and increase the risk of infections.[33]

54.     Further, "[t]here is no evidence that the harm caused by arsenic is reversible."[34]

55.     Based on the risks associated with exposure to higher levels of arsenic, both the FDA and the Environmental Protection Agency (EPA) have set limits concerning the allowable limit of arsenic at 10 parts per billion for human consumption in apple juice and drinking water.[35]

---

[29] *Arsenic*, WHO, *supra* note 12; Ziwei, *supra* note 13.

[30] National Institute of Environmental Health Sciences, *Arsenic and Your Health* (2023) [hereinafter *Arsenic and Your Health*], http://www.niehs.nih.gov/sites/default/files/health/materials/arsenic_and_your_health_508.pdf.

[31] *Arsenic*, WHO, *supra* note 12; Stephen J. Genuis et al., *Toxic Element Contamination of Natural Health Products and Pharmaceutical Preparations*, PLOS ONE (Nov. 21, 2012), 7(11): e49676, https://doi.org/10.1371/journal.pone.0049676 ("[C]hronic arsenic exposure has been linked to dermatological lesions and malignancies.").

[32] *Arsenic and Your Health*, *supra* note 30, at 3.

[33] American Cancer Society, *Arsenic and Cancer Risk*, https://www.cancer.org/cancer/risk-prevention/chemicals/arsenic.html (last revised June 1, 2023).

[34] Healthy Babies Bright Futures, *What's in My Baby's Food?* at 13 (2019), https://hbbf.org/sites/default/files/2022-12/BabyFoodReport_ENGLISH_R6_0.pdf.

[35] *See Action Level for Inorganic Arsenic in Apple Juice: Guidance for Industry*, FDA (June 2023), https://www.fda.gov/media/86110/download; 21 C.F.R. § 165.110(b)(4)(iii)(A).

**The Harmful Effects of Cadmium Consumption**

56.     Cadmium, like lead and arsenic, is a naturally occurring heavy metal that "causes direct harm to humans in several forms."[36]

57.     There is no known safe level of exposure to cadmium,[37] and cadmium has no known beneficial function in the human body.[38]

58.     Cadmium, like lead, "displays a troubling ability to cause harm at low levels of exposure."[39]

59.     The U.S. Department of Health, the International Agency for Research on Cancer, the World Health Organization, and the EPA have all identified cadmium as a human carcinogen.[40]

60.     Like lead, cadmium accumulates in the body. Because it has a long half-life of 6 to 38 years in the kidneys and 4 to 19 years in the liver, it "sequester[s] in [human] tissues."[41]

61.     Cadmium exposure may be associated with prostrate, bladder, pancreatic, kidney, and breast cancers; the development of diseases related to the central nervous system including Alzheimer's, Parkinsonism and Parkinson's disease, Huntington's disease, amyotrophic lateral sclerosis, multiple sclerosis, and osteoporosis.[42]

---

[36] Andrew L. Koons & Venkat Rajasurya, *Cadmium Toxicity*, National Library of Medicine (Aug. 14, 2023), https://www.ncbi.nlm.nih.gov/books/NBK536966.

[37] *See* Closer to Zero Public Meeting, *supra* note 10, at 32, 72, 179.

[38] *What Is the Biological Fate of Cadmium in the Body?*, Agency for Toxic Substances and Disease Registry, https://archive.cdc.gov/www_atsdr_cdc_gov/csem/cadmium/Biological-Fate.html (last reviewed May 23, 2023).

[39] *Is Homemade Baby Food Better?*, Healthy Babies Bright Futures (2022), at 18, 69, https://hbbf.org/sites/default/files/2023-03/BabyFoodReport2022_R11_Web.pdf.

[40] *Public Health Statement for Cadmium*, Agency for Toxic Substances and Disease Registry, https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last reviewed Mar. 12, 2015).

[41] Genius, *supra* note 31; ATSDR, *What Is the Biological Fate of Cadmium in the Body?*

[42] Angelika Edyta Charkiewicz, et al., *Cadmium Toxicity and Health Effects- A Brief Summary*. Molecules (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10537762.

62.     Cadmium is also suspected to be mutagenic, meaning it can cause genetic mutation and can inhibit DNA repair and induce DNA strand breaks and chromosomal aberrations.[43]

63.     Chronic exposure to even lower levels of cadmium can damage the kidneys, liver, and other parts of the body, and cause bones to become fragile and easily break.[44] "[A]ny cadmium exposure should be avoided."[45]

64.     Other effects of cadmium exposure can include gastrointestinal issues, hemorrhagic gastroenteritis, liver and kidney necrosis, cardiomyopathy, and metabolic acidosis.[46]

**Plaintiff's Purchases of Defendant's Product**

65.     Plaintiff purchased and consumed the Product, which Defendant's representations and omissions led him to believe was a safe supplement free from potentially harmful substances.

66.     Plaintiff first purchased the Product from the "NAKED Store" Amazon webpage in or around 2023.

67.     Plaintiff most recently purchased the Product in March 2025.

68.     Plaintiff consumed approximately two servings of the Product daily.

69.     The presence or serious risk of exposure to heavy metals is material to customers when making their purchasing decisions.

70.     Defendant materially misled its customers by misrepresenting the Product's safeness for frequent consumption and by failing to disclose that its Product contained dangerous

---

[43] *See, e.g.*, Yong Hwan Jin et al., *Cadmium is a mutagen that acts by inhibiting mismatch repair*, Nat. Genet. (2003), https://pmc.ncbi.nlm.nih.gov/articles/PMC2662193.
[44] *Public Health Statement for Cadmium*, Agency for Toxic Substances and Disease Registry, https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last reviewed Mar. 12, 2015).
[45] M. Nathaniel Mead, *Cadmium Confusion: Do Consumers Need Protection?*, Environ. Health Perspect. (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210.
[46] *What Health Effects Are Associated With Acute High-Dose Cadmium Exposure?*, Agency for Toxic Substances and Disease Registry, https://archive.cdc.gov/www_atsdr_cdc_gov/csem/cadmium/Acute-Effects.html (last reviewed May 23, 2023).

contaminants like lead in excess of safe levels. This omission deprived Plaintiff and other Class Members of the benefit of their bargain by causing them to pay a premium for a product that they otherwise would not have paid had they been fully informed. If Plaintiff and other Class Members were aware of the levels of heavy metals found in Defendant's Products, they would have purchased less expensive, comparable protein powders that are available in the market.

**Poorly Sourced Plant-Based Proteins Can Contain Heavy Metals**

71.     The sourcing of ingredients in plant-based protein powders is a particularly important consideration because any contaminants that are in the source plants have the potential to infiltrate the product.

72.     Lead and other heavy metals exist naturally in the Earth's crust and in many soils across the globe.

73.     Plants take up minerals and trace elements from the soil in which they grow. If a field's soil is enriched by industrial pollution, historic lead deposition, irrigation water, or heavy use of certain fertilizers, the plants in that field might take up more lead than plants in cleaner soil.[47]

74.     Not all plant-based proteins contain heavy metals, however. With proper sourcing, testing, and quality control measures, it is possible to produce plant-based protein powders with minimal heavy metal contamination.[48]

---

[47] *See* Zahir Ur Rehman et al., *Transfer of Heavy Metals from Soils to Vegetables and Associated Human Health Risks at Selected Sites in Pakistan*, Pedosphere (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC6527332; European Food Safety Authority, *Scientific Opinion on Lead in Food*, EFSA Journal (2010) at 3, https://efsa.onlinelibrary.wiley.com/doi/abs/10.2903/j.efsa.2010.1570.

[48] *See, e.g.*, Paris Martineau, *Readers Asked Us to Test These 5 Protein Powders. All Had Low Levels of Lead*, Consumer Reports (Jan. 8, 2026), https://www.consumerreports.org/health/food-safety/these-five-protein-powders-had-low-lead-levels-a1151050701 (identifying two plant-based protein powders with significantly lower levels of heavy metals than the Products).

75.    For example, in January 2026, Consumer Reports tested two additional plant-based protein powders and found significantly lower levels of heavy metals in those products.[49]

## CLASS ALLEGATIONS

76.    Plaintiff brings this class action under Federal Rule of Civil Procedure 23 and seeks certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23. Plaintiff seeks certification of the following Class.

> All persons residing in the United States or its territories who purchased the Products at any time within the applicable limitations period.

77.    Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or to add or modify subclasses after having had an opportunity to conduct discovery.

78.    Numerosity. Fed. R. Civ. P. 23(a)(1). Defendant reports having more than 179,000 customers. At a minimum, there are tens of thousands of Class Members but very likely many more. The exact size of the proposed class can be ascertained from Defendant's records and those of the retailers that sell the Product.

79.    Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. Common issues include but are not limited to:

a.    Whether Defendant's marketing, advertising, labeling, and other representations regarding the Product were misleading and/or deceptive;

b.    Whether Defendant's conduct is deceptive in violation of FDUTPA;

c.    The nature of the relief, including equitable relief, to which Plaintiff and the class are entitled; and

---

[49] *Id.*

    d.   Whether Plaintiff and Class Members are entitled to reasonable attorneys' fees and costs.

80.    Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class(es) he seeks to represent. Plaintiff and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendant's unlawful conduct.

81.    Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the Class(es). Further, Plaintiff has retained counsel with extensive experience litigating complex class actions. Plaintiff's counsel has been appointed by state and federal courts to represent certified classes in dozens of cases.

82.    Superiority. Fed. R. Civ. P. 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy. The claims of Plaintiff and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendant, and it would be impracticable for class members to seek redress individually. Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments. Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendant's misconduct. Class certification is therefore appropriate under Rule 23(b)(3).

83.    Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

84.     Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2), as Defendant has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

**FIRST CAUSE OF ACTION**

**VIOLATIONS OF FLORIDA DECEPTIVE AND
UNFAIR TRADE PRACTICES ACT (FDUTPA)
FLA. STAT §§ 501.201, *et seq.***

**On behalf of Plaintiff and the Class**

85.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

86.     Pursuant to Fla. Stat. § 501.204(1), FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

87.     The purpose of FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

88.     At all times relevant herein, Defendant solicited, advertised, offered, provided and distributed goods in the State of Florida, and thereby was engaged in trade or commerce pursuant to Fla. Stat. § 501.203(8).

89.     Plaintiff and other members of the Class are consumers pursuant to Fla. Stat. § 501.203(7).

90.     Defendant engaged in unfair and deceptive acts in violation of FDUTPA, by making materially misleading statements and omissions regarding the health and safety of the Product, which prevent Plaintiff and the Class from learning that Defendant's Product contained dangerous heavy metals like lead.

91.     Defendant's acts and omissions caused Plaintiff and the Class to reasonably believe that they were purchasing for consumption a product that was healthy and safe. Plaintiff and the Class reasonably relied on Defendant's material representations and omissions when purchasing the Product. Defendant failed to disclose or intentionally concealed the presence or risk of harmful contaminants in the Product, including lead, which would have been a material consideration of Plaintiff and the Class's purchasing decisions.

92.     Defendant's deceptive acts and omissions deprived Plaintiff and the Class of the benefit of their bargain. By failing to disclose or intentionally concealing the presence or risk of heavy metals in the Product, Defendant caused Plaintiff and the Class to pay a premium for a purportedly safe and nutritious product.

93.     Defendant knew or should have known that its material representations and omissions regarding the safety of the Product were false or misleading, yet caused such representations to be promoted and distributed throughout Florida and nationwide through advertising, marketing, and other promotional channels.

94.     Defendant's deceptive acts and omissions directly and proximately caused Plaintiff and other Class Members to suffer an ascertainable loss. Plaintiff would not have purchased, and at a minimum would not have paid the same price for, Defendant's Product had Defendant disclosed the risk and/or presence of dangerous contaminants in its Product.

95.     Comparable and less expensive products similar to those of Defendant's without excessive heavy metal content are widely available, and Plaintiff and other Class Member could have purchased those alternatives had they been informed of the dangerous heavy metals present in Defendant's Product.

96.     Plaintiff seeks all damages available under the law, including but not limited to monetary, statutory damages, compensatory, treble and punitive damages, restitution, and disgorgement of all monies obtained as a result of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

97.     Defendant's conduct also caused substantial injury to the public, who relied on Defendant's representations that the Product was nutritious, clean, and safe for daily use and was unaware of Defendant's material omissions. Defendant's failure to disclose that the Product contained toxic heavy metals deprived consumers of the ability to make an informed decision whether to purchase and thereby ingest the Product. Aside from the economic harm this caused, the trust of the public in products that claim to be nutritious, healthy, and safe for everyday use is compromised. Defendant's conduct must be enjoined so as to not cause further irreparable harm and risk of further injury.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the class of similarly situated individuals, request the Court to:

(a) Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiff as representative of the class and appoint his counsel as Class Counsel;

(b) Order Defendant to provide actual damages and equitable monetary relief (including restitution) to Plaintiff and class members and/or order Defendant to disgorge profits they realized as a result of its unlawful conduct;

(c) Order Defendant to pay punitive damages, as allowable by law, to Plaintiff and class members;

(d) Order Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and class members;

(e) Declare Defendant conduct unlawful and enter an order enjoining Defendant from continuing to engage in the conduct alleged herein;

(f) Award both pre- and post-judgment interest at the maximum allowable rate on any amounts awarded;

(g) Award costs of the proceedings herein;

(h) Award reasonable attorneys' fees as allowed by law; and

(i) Award such other relief as the Court deems appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on issues so triable.

DATED: February 13, 2026                Respectfully submitted,


*/s/ Andrew Shamis*
Andrew J. Shamis
Florida Bar No. 101754
**SHAMIS & GENTILE, P.A**.
14 NE 1st Ave., Suite 705
Miami, Florida 33132
T: 305-479-2299
ashamis@shamisgentile.com

Nicholas A. Coulson (*pro hac vice*)
Ellyn Gendler (*pro hac vice*)
Julia Prescott (*pro hac vice forthcoming*)
**COULSON P.C.**
300 River Place Drive, Suite 1700
Detroit, Michigan 48207
T: (313) 644-2685
nick@coulsonpc.com
egendler@coulsonpc.com
jprescott@coulsonpc.com


*Attorneys for Plaintiff and the Putative Class*